CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 31 2012

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| OLUYOMI MARTINS,<br>    Plaintiff, | Civil Action No. 7:11-cv-00252 |
| v. | **MEMORANDUM OPINION** |
| BETTY AKERS, et al.,<br>    Defendants. | By:  Hon. James C. Turk<br>       Senior United States District Judge |

Oluyomi Martins, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Plaintiff names as defendants Betty Akers, a nurse at the New River Valley Regional Jail ("Jail"); Dr. Moses, a doctor at the Jail; C/O Murphy, a Captain at the Jail; Dr. John Marsh, a doctor at the Augusta Correctional Center ("ACC"); and Dr. Mark Amonette, a doctor at the Powhatan Correctional Center ("PCC"). Plaintiff alleges that defendants violated the Eighth Amendment's prohibition of cruel and unusual punishment. Defendants filed motions to dismiss and for summary judgment, and the time for plaintiff to respond expired. After reviewing plaintiff's submissions, the court grants defendants' motions to dismiss and for summary judgment.

I.

The record reveals the following facts. On May 13, 2009, plaintiff slipped while playing basketball at the Jail, hurt his ankle, and was taken to the Jail's medical department. A nurse examined him, determined plaintiff had a swollen ankle, and prescribed Motrin, 400 mg., twice a day for three days. Plaintiff disagreed with the diagnosis because of his past experiences playing sports. Akers decided to house plaintiff in the medical department for observation, but plaintiff said he was "OK" and wanted to go back to his cell. Defendant Akers observed that plaintiff had full range of motion in the ankle before allowing him to go back to his cell. Plaintiff was advised

to alert medical staff if the ankle continued to swell, which it did from walking up and down stairs and getting into a top bunk.

Plaintiff asked Captain Murphy to move him to a different cell in the pod or to the medical pod. Jail procedures required plaintiff to file a written inmate request form if he had a medical concern about a cell assignment or to file grievances about not being moved to a different cell. Captain Murphy does not remember plaintiff asking him to be moved, and plaintiff did not file a written inmate request form or grievance form about the cell assignment.

Plaintiff filed a grievance on May 16, 2009, complaining about the expiration of the Motrin prescription, and plaintiff filed medical request forms on May 18 and 19, 2009, for treatment of the swollen ankle. Plaintiff returned to the medical department on May 20, 2009, where a nurse examined the ankle, noted swelling and positive movement in plaintiff's toes, gave plaintiff a Motrin and a cold compress, and sent plaintiff for an X-ray of the ankle. The X-ray revealed soft-tissue swelling but no broken bones. Akers added plaintiff to the list to see Dr. Moses.

Plaintiff returned to the medical department on June 2, 2009, complaining that his ankle still hurt. The ankle was slightly swollen, staff consulted with Dr. Moses, and Dr. Moses referred plaintiff to an orthopedic surgeon. On June 3, 2009, plaintiff saw the surgeon, who suspected a partially-ruptured Achilles tendon and ordered an MRI to determine whether surgery was necessary. Plaintiff received a fracture boot and was told to limit weight-bearing activities.

Dr. Moses met with plaintiff on June 5, 2009, explained the surgeon's diagnosis, and ordered an MRI. The MRI, which occurred on June 19, 2009, showed a partial thickness or interstitial tear of the Achilles tendon and confirmed that no complete rupture, full-thickness tear, or tendon retraction existed.

On June 23, 2009, plaintiff returned to the surgeon, who recommended plaintiff continue wearing the fracture boot. A July 14, 2009, MRI showed a complete to near-complete rupture of the Achilles tendon and a probable rupture of the ligament. On July 21, 2012, the surgeon's office called the Jail's medical staff, explained that plaintiff's ankle was worse, and asked if plaintiff had reinjured the ankle or was not wearing the fracture boot. Akers responded that Jail security staff saw plaintiff improperly wearing the boot. Plaintiff admits that he routinely tightened four of the five boot straps but only "loosely" fastened the strap that tightened the boot around the swollen ankle.

Plaintiff returned to the surgeon's office on July 27, 2009. The surgeon continued the medical order for plaintiff to wear the fracture boot, gave plaintiff a Theraband and exercise instruction sheets, and ordered that plaintiff use a Theraband to exercise the foot twice a day for three to four weeks.

Plaintiff returned to the Jail's medical department on July 29, 2009, for an unrelated medical issue. Plaintiff properly performed the Theraband exercises in the medical department and was permitted to do Theraband exercises in his cell. Plaintiff reported to the medical department on August 9, 2009, rating the ankle pain as a three out of ten, and on August 16, 2009, saying that he was feeling much better.

Plaintiff returned to the surgeon on August 27, 2009, for a follow up appointment. The surgeon's office reported that the tear had clinically healed but plaintiff needed physical therapy twice per week for three weeks. Plaintiff went to physical therapy on September 8, 11, 15, and 16, 2009. The surgeon extended physical therapy for another three weeks, and plaintiff went to physical therapy on September 18, 23, 25, 29, and 30 and October 2 and 6, 2009. On October 7, 2009, the surgeon ordered plaintiff to wean himself from the brace but to continue physical

3

therapy, which plaintiff resumed on October 8, 9, 16, and 21, 2009. Plaintiff was transferred from the Jail to the PCC on October 23, 2009.

Plaintiff told a nurse about his heel upon arrival at the PCC. PCC staff assigned him to a third-floor cell and did not automatically provide physical therapy. Plaintiff filed requests and complaints until he saw Dr. Amonette, who scheduled plaintiff to see a physical therapist at the PCC. The therapist said plaintiff should be moved to a facility that has specialized equipment, but Dr. Amonette said nothing else could be done about getting him physical therapy at the PCC. Plaintiff alleges he did not receive any physical therapy and "just limped around in pain" at the PCC until his transfer to the ACC on April 21, 2010.

Plaintiff told Dr. Marsh about the heel injury at his ACC medical intake screening. ACC staff assigned plaintiff to a top bunk on the third floor. Dr. Marsh authorized plaintiff to see an orthopedic doctor at a local hospital, who ordered an MRI, recommended physical therapy, and suggested surgery as a last resort. The MRI revealed significant scar tissue but that that the tendon was no longer torn. Plaintiff complained that he still had limited mobility and range of motion, but he did not receive any further treatment at the ACC until his transfer on December 7, 2010, to another correctional facility.

Plaintiff alleges that he still limps and experiences pain in his injured tendon. Plaintiff's limping has allegedly caused "severe hip and knee problems" because the original injury was not timely treated. Plaintiff requests $5 million as relief.

II.

On November 29, 2011, Dr. Amonette filed a motion to dismiss the claims against him because plaintiff allegedly failed to state a claim upon which relief may be granted. Dr. Amonette certified that a copy of the motion and supporting brief were mailed to plaintiff at his

address of record on the same day. On November 29, 2011, the Clerk issued a notice that advised plaintiff of Dr. Amonette's motion to dismiss and gave plaintiff twenty-one days to respond. The notice specifically said:

> If Plaintiff does not respond to [Dr. Amonette]'s pleadings, the Court will assume that Plaintiff has lost interest in the case, and/or that Plaintiff agrees with what [Dr. Amonette] states in [his] responsive pleading(s). If Plaintiff wishes to continue with the case, it is necessary that Plaintiff respond in an appropriate fashion. . . . <u>However, if Plaintiff does not file some response within the twenty-one (21) day period, the Court may dismiss the case for failure to prosecute</u>.

(Notice (no. 22) (original emphasis).)

Plaintiff did not respond to Dr. Amonette's motion to dismiss, no mail to plaintiff was returned to the court as undeliverable, and plaintiff has been incarcerated at the same facility during the relevant time. Pursuant to the court's November 30, 2011, notice, the court finds that plaintiff has lost interest in pursuing claims against Dr. Amonette and agrees with Dr. Amonette's arguments in the motion to dismiss. Accordingly, the court grants Dr. Amonette's motion to dismiss.

III.

Defendants Marsh, Akers, Moses, and Murphy filed motions for summary judgment, to which plaintiff responded. A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-

5

movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

Even if there is no dispute as to the evidentiary facts, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). A court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio,

6

Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. See Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief opposing summary judgment); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (same).

A.

Defendants argue that plaintiff failed to exhaust administrative remedies for several claims arising at the Jail. The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under [§ 1983] . . ., by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory and "applies to all inmate suits about prison life[.]" Porter v. Nussle, 534 U.S. 516, 524, 532 (2002). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90 (2006). When a prison provides an administrative grievance procedure, an inmate must file a grievance raising a particular claim and pursue it through all available levels of appeal to "properly exhaust." Id.; Dixon v. Page, 291 F.3d 485, 490-91 (7th Cir. 2002). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process . . ., the process that exists on paper becomes unavailable in reality." Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006). An inmate's failure to exhaust is an affirmative defense that a defendant has the burden to prove. Jones v. Bock, 549 U.S. 199, 216 (2007).

7

The NRV Jail's Superintendent avers that the Jail had a formal grievance policy effective during the relevant times of plaintiff's claims. That grievance procedure allows an inmate to grieve an issue only after proper means have been used to informally resolve the issue. Once the inmate's grievance is submitted, a response to the grievance should be provided within 9 days. If the inmate is not satisfied with this response, then the inmate may appeal using an Appeal Form, which is readily available. The inmate is required to submit an appeal within 48 hours after receiving the grievance response, and the decision on the appeal is a final decision. All inmates, including plaintiff, are oriented to the grievance procedure when they arrive at the Jail.

The Superintendent reviewed plaintiff's grievance file and discovered plaintiff's May 16, 2009, grievance about being charged for a Motrin pill that he did not receive. Akers responded to the grievance on May 20, 2009, and plaintiff did not appeal the response. Accordingly, plaintiff did not exhaust a complaint about not receiving a Motrin. The Superintendent avers that he did not find any grievance from plaintiff about a delay in seeing a doctor, a delay in receiving treatment for the ankle injury, or a change in cell assignment.

Plaintiff argues in response that he "did follow the grievance procedure by completing the first steps, attempting to solve the problem informally." Thus, plaintiff admits he did not fully exhaust the grievances by pursuing any claim past the informal stage. Plaintiff's inmate request forms also do not qualify as "grievances" under the Jail's policy. Although plaintiff complains that he did not receive a "formal explanation" of the grievance procedure, he acknowledges that inmates receive a handbook of Jail policies and procedures when arriving at the Jail, and he does not say that he did not receive a handbook when he arrived. Plaintiff's argument that he could not exhaust claims arising after May 2009 because he was transferred in October 2009 is specious. Plaintiff does not allege any inability to file a grievance during the

8

relevant six-month period he was at the Jail or after he was transferred. Accordingly, plaintiff did not exhaust available administrative remedies about the events at the Jail, and Akers, Moses, and Murphy are entitled to summary judgment.

B.

A plaintiff must show that a defendant acted with deliberate indifference to a serious medical need to succeed on an Eighth Amendment claim for the unconstitutional denial of medical assistance. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). See Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52. A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness. Id. at 851. A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, such as loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. Sosebee, 797 F.2d at 181-83.

Claims of medical malpractice and negligent diagnosis are not cognizable in a § 1983 proceeding. Estelle, 429 U.S. at 105-06. See Sosebee, 797 F.2d at 181; Johnson v. Quinones,

9

145 F.3d 164, 168-69 (4th Cir. 1998) (noting that treating doctors must actually draw the inference that an inmate's symptoms signify the presence of a particular condition and that a failure to draw such an inference may present a claim for negligence, but not a claim under the Eighth Amendment). A prisoner's disagreement with medical personnel over the course of treatment does not state a § 1983 claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam).

Plaintiff fails to establish that Akers or Dr. Moses was deliberately indifferent to a serious medical need. Akers wanted to house plaintiff in the medical department to observe his swollen ankle, but plaintiff returned to his cell. When plaintiff complained about increased pain, Akers arranged for plaintiff to see Dr. Moses. Dr. Moses' involvement with plaintiff's ankle is limited to referring plaintiff to an orthopedic surgeon, who ordered plaintiff's treatment after discovering the partial tear of the Achilles tendon via an MRI. Akers could not have been aware that plaintiff had a partially-torn Achilles tendon when he first arrived at the Jail's medical department with a swollen ankle. Plaintiff fails to establish Akers' or Dr. Moses' deliberate indifference and fails to establish that any delay in treatment by Akers or Dr. Moses caused any worse condition.

Plaintiff fails to establish that Dr. Marsh was deliberately indifferent to a serious medical need. The record establishes that Dr. Marsh reviewed plaintiff's medical history when plaintiff arrived at the ACC and referred plaintiff to a specialist doctor to further investigate plaintiff's torn Achilles heel. The specialist concluded that an MRI would be helpful to assess the tendon, but if the MRI showed the tendon was intact, surgery was not necessary and physical therapy was appropriate "for strengthening and work[ing] on mobility of the Achilles and the gastroc complex." The MRI revealed that the Achilles tendon had healed, albeit with excess scar tissue. Pursuant to the specialist's instructions, Dr. Marsh prescribed naproxen and stretch exercises,

which were explained to plaintiff on August 10, 2010. Accordingly, plaintiff fails to establish that Dr. Marsh was deliberately indifferent to any serious medical need. Plaintiff's disagreement with how Dr. Marsh incorporated physical therapy into plaintiff's treatment plan is not a sufficient basis for an Eighth Amendment claim.

Plaintiff alleges that he asked Captain Murphy to let him be counted in his cell or moved to the medical pod, but plaintiff's request was not granted. Plaintiff complains that he was required "to limp up and down twenty stairs over six times a day for count times and meals." Plaintiff says, "Even though my ankle was about four times its normal size and multiple personnel saw an[d] inquired about it, I was still made to limp down the steps, which put me in extreme pain, and made my injury even worse."

To succeed with an unconstitutional medical treatment claim against non-medical prison personnel, plaintiff must show that such the official was personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or were deliberately indifferent to the prison physician's misconduct where even a lay person would understand that the medical care provider is being deliberately indifferent. Miltier, 896 F.2d at 854. Supervisory prison officials are entitled to rely on the professional judgment of trained medical personnel. Id.

Plaintiff fails to establish that Captain Murphy interfered with treatment or was personally aware of and actually recognized facts indicating a substantial risk of serious harm. Plaintiff does not allege that Murphy actually ever saw or was otherwise aware of plaintiff's ankle injury. Furthermore, Murphy, who has no medical training, would have no basis to know that plaintiff's limping or swollen ankle resulted from a torn tendon instead of a simple sprained ankle. No one at the Jail, including Murphy, knew plaintiff's ankle injury involved an Achilles

11

tendon until the orthopedic surgeon evaluated plaintiff. Therefore, plaintiff's limping up and down the stairs did not present an obviously serious medical need. See, e.g., Galego v. Scott, 2011 U.S. Dist. LEXIS 122002, at *8-10, 2011 WL 6752563, at *3 (D. Nev. Sept. 8, 2011) (collecting cases to support that a sprained ankle and chronic ankle pain without a fracture are not "serious medical needs").

IV.

For the foregoing reasons, the court grants Dr. Amonette's motion to dismiss; Dr. Marsh's motion for summary judgment; and Akers, Moses, and Murphy's motion for summary judgment.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff.

**ENTER**: This _31st_ day of July, 2012.

/s/ James C. Turk
Senior United States District Judge